IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA

CHARLOTTE DIVISION

3:12-cv-559

CATAWBA RIVERKEEPER          )
FOUNDATION and CLEAN AIR     )
CAROLINA,                    )
                             )
            Plaintiffs,      )
                             )
      v.                     )
                             )          **COMPLAINT**
NORTH CAROLINA DEPARTMENT OF )      **FOR DECLARATORY AND**
TRANSPORTATION, EUGENE CONTI,)       **INJUNCTIVE RELIEF**
SECRETARY, NCDOT, FEDERAL    )
HIGHWAY ADMINISTRATION, JOHN F. )
SULLIVAN, DIVISION           )
ADMINISTRATOR, FHWA,         )
                             )
            Defendants.      )
_____)

## INTRODUCTION

1.      This action challenges violations of the National Environmental Policy Act

("NEPA"), 42 U.S.C. § 4321 et seq. and the Administrative Procedure Act, 5 U.S.C. §§ 701-06,

in connection with the decisions by the North Carolina Department of Transportation

("NCDOT") and the Federal Highway Administration ("FHWA") (collectively, the

"transportation agencies") to construct the Gaston East-West Connector Toll Highway in Gaston

and Mecklenburg Counties, North Carolina.  The proposed 22-mile road project (the "Toll

Road") would constitute a new location toll highway from I-85 west of Gastonia in Gaston

County to I-485 near the Charlotte-Douglas Airport in Mecklenburg County.  As set out more

fully below, the transportation agencies have acted arbitrarily and capriciously in issuing the

Environmental Impact Statement ("EIS") and the Record of Decision ("ROD") for the Toll

Road.

2.     The proposed $930 million Gaston East-West Connector would displace 348 households and 37 businesses and would impact 25 neighborhoods.  The Toll Road also would impact over eight miles of streams, including 91 stream crossings; would fragment wildlife habitat; and impact 882 acres of forest.  A number of federal and state resource and permitting agencies have raised substantial concerns about the project throughout the administrative process.

3.     NEPA requires defendants to prepare a draft and then a final EIS that thoroughly examines and discloses the project's direct, indirect and cumulative environmental and social impacts, and that rigorously explores and objectively evaluates a range of reasonable alternatives that meet the basic purpose of the project.  A core purpose of NEPA is to inform the public, decision-makers and resource agencies about the environmental impacts of different alternatives. The NEPA process must be conducted in good faith, must be fully transparent, and must respond to concerns raised by the public. The Gaston East-West Connector EIS fails all these requirements.

4.     The United States Court of Appeals for the Fourth Circuit recently invalidated defendants' NEPA review for a similar toll highway proposal, the Monroe Connector/Bypass. N.C. Wildlife Fed'n v. NCDOT, 677 F.3d 596 (4th Cir. 2012).  In its decision, the Fourth Circuit condemned the NEPA analysis for the Monroe Connector/Bypass in which defendants – the same defendants as in the present action – compared "building the road" with "building the road" in their impacts and alternatives analysis, and were not candid with the public and state and federal resource agencies.  Defendants' analysis for the Gaston East-West Connector is infected with the same arbitrary and capricious analysis.

5.     First, the FEIS fails to account for all of the direct, indirect, and cumulative environmental impacts that construction of the Gaston East-West Connector would create, including a fundamentally flawed analysis of indirect impacts that compared "building the road" with "building the road," and that, as a result, failed to account for any of the growth that will be occasioned by the construction of the Gaston East-West Connector.

6.     Second, the arbitrary and capricious analysis of alternatives was based on fundamentally flawed traffic forecasts that also compared "building the road" with "building the road." All traffic forecasts were based on a single set of socio-economic forecasts and thus failed to consider the additional traffic induced by the Toll Road. This arbitrary analysis led the transportation agencies to abandon a number of potentially feasible alternatives early in the process. Additionally, a number of reasonable alternatives were abandoned supposedly due to their asserted failure to meet the stated purpose and need for the project. However, the alternative ultimately selected also failed to meet the same identified objectives.

7.     Third, defendants misled the public and resource agencies by purposefully obscuring the methodology behind their essential analysis of indirect impacts, "smoothing" and altering data to make it more politically palatable, and refusing to address and refute a much-publicized economic study on behalf of local officials that contradicted the analysis in the EIS.

8.     Fourth, defendants failed to supplement the Environmental Impact Statement to address significant developments since the EIS was originally issued including the recent ruling by the United States Court of Appeals for the Fourth Circuit that invalidated their similarly flawed analysis for the proposed Monroe toll highway; recent census data that undermine the stated need for the road; and funding hurdles that make the project infeasible, including the fact

that the majority of the Gaston County representatives in the North Carolina General Assembly now oppose the project.

**JURISDICTION AND VENUE**

9.      This action arises under NEPA, 42 U.S.C. § 4321 et seq.  This Court has jurisdiction pursuant to 28 U.S.C. § 1331, and may issue declaratory and further relief pursuant to 28 U.S.C. §§ 2201 and 2202.  Plaintiffs are entitled to bring this action pursuant to the Administrative Procedure Act, 5 U.S.C. §§ 701-06.

10.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e).

**PARTIES AND STANDING**

**Plaintiffs**

11.      Plaintiff Catawba Riverkeeper Foundation (the "Riverkeeper") is a § 501(c)(3) not-for-profit public-interest organization whose mission is to advocate for the health, protection, and enjoyment of the Catawba River watershed.  The organization was founded in 1997 and operates in the 24 counties of the Catawba River watershed.  The Riverkeeper is committed to providing accurate, science-based information about the watershed and the issues affecting it.  The Riverkeeper has 860 members who work to protect and enhance the Catawba River Basin today and for future generations.

12.      The Riverkeeper has many members who live in the vicinity of the proposed Toll Road both in Mecklenburg and Gaston Counties.

13.      In addition, the Riverkeeper's members utilize the surface waters that will be affected by the project for drinking water, recreation (including swimming, rowing, sailing, water skiing, fishing, paddling, and other activities), irrigation, and other uses.  The use of these waters by the Riverkeeper's members will be negatively affected by pollution of the waters by the project.  The proposed project will also destroy natural areas currently used and enjoyed by

the Riverkeeper's members. Finally, many of the Riverkeeper's members own property abutting waters that will be directly and indirectly affected by the proposed project, and it is anticipated that their property values will be reduced by pollution from the project.

14. The Riverkeeper's members are very concerned about trash in our waters, and the Riverkeeper organizes various cleanups of waters that will be affected by the project, including the Lake Wylie Riversweep, which in recent years has involved over 1000 volunteers and removed in one day over 80 tons of trash from Lake Wylie. It is anticipated that the proposed Toll Road project will significantly increase the amount of trash in Lake Wylie.

15. The Riverkeeper monitors and participates in highway and transportation planning in Mecklenburg and Gaston Counties, as well as other counties, and aims to improve North Carolina water quality by reshaping the practice of relying almost exclusively on highways for transportation needs, which has a direct negative impact on water quality and encourages sprawl with associated negative impacts on water quality.

16. The Riverkeeper has been active in its opposition to the proposed Toll Road. The Riverkeeper, through its members and staff, has voiced opposition to the project at public meetings held by defendants. The Riverkeeper and its members have participated in the NEPA process, and submitted comments on the project both on its own behalf and through counsel.

17. Plaintiff Clean Air Carolina is a not-for-profit corporation founded in 2002. Clean Air Carolina has 120 members in North Carolina. Its mission is to ensure cleaner air quality for all by educating the community about how air quality affects health, advocating for stronger clean air policies, and partnering with other organizations committed to cleaner air and sustainable practices. Its primary goal is to improve health by achieving the cleanest air possible. Clean Air Carolina aims to improve North Carolina air quality by reshaping the

practice of relying almost exclusively on highways for transportation needs and supports a multi-modal system, including more passenger rail, bike and pedestrian options, and consequent development patterns that will lead to less single-occupant auto travel.

18.     Clean Air Carolina is based in Charlotte and works on regional and statewide issues.  The organization has specific concerns about air quality in the Charlotte region.  Clean Air Carolina has members who live in Gaston and Mecklenburg Counties who are impacted by poor air quality.

19.     Clean Air Carolina monitors and participates in highway and transportation planning in Gaston and Mecklenburg Counties, has participated in the administrative processes surrounding the planning of the Gaston East-West Connector in these counties, and has members who participated in this process, including the process leading to the approval of the ROD challenged in this case.  Clean Air Carolina seeks to inform and educate its members and the public concerning highway and transportation planning and the impacts of transportation decisions on the human environment, and advocates for transportation planning and policies that will have the least long-term impact on the human environment.  These organizational interests are directly and irreparably injured by defendants' violations of law described in this complaint.

20.     Clean Air Carolina has been active in its opposition to the proposed Toll Road. Clean Air Carolina, through its members and staff, has voiced opposition to the project at public meetings held by defendants.  Clean Air Carolina and its members have participated in the NEPA process and submitted comments on the project through counsel.

21.     The Riverkeeper and Clean Air Carolina are referred to herein collectively as the "Conservation Groups."

**Defendants**

22.     Defendant North Carolina Department of Transportation ("NCDOT") is an agency of the State of North Carolina.  On July 17, 2009, before publication of the FEIS and the ROD, the functions and funds of North Carolina Turnpike Authority ("NCTA") were transferred to NCDOT.  NCTA is thus now located within the Department of Transportation and is subject to and under the direct supervision of the Secretary of Transportation.  N.C. Gen. Stat. § 136‑89.182.  NCDOT is responsible for complying with NEPA before proceeding with projects that involve major federal action, and had the primary responsibility for preparing the arbitrary and capricious EIS and ROD challenged in this action.  NCDOT issued this arbitrary and capricious environmental analysis through its office in Raleigh. NCDOT is relying on the FEIS and ROD to pursue permits for this project.

23.     Eugene Conti is the Secretary of NCDOT.  Secretary Conti had the final authority for the State's preparation of the arbitrary and capricious environmental analysis challenged in this action and for the State's decision to proceed with the challenged project despite this arbitrary and capricious analysis.  Secretary Conti is sued in his official capacity.

24.     The Federal Highway Administration is the lead federal agency within the U.S. Department of Transportation.  FHWA was responsible for overseeing the preparation of the arbitrary and capricious environmental analysis challenged in this action and for ensuring that this analysis complied with NEPA.  FHWA issued this arbitrary and capricious environmental analysis through its office in Raleigh, North Carolina.

25.     John F. Sullivan is the North Carolina Division Administrator for FHWA.  Mr. Sullivan had the final authority for FHWA's preparation and approval of the arbitrary and capricious FEIS and ROD challenged in this action.  Mr. Sullivan is sued in his official capacity.

# FACTS

## Project Setting and History

26.     The Toll Road has assumed various forms over the years, and has been referred to as the "Garden Parkway," the "US 321/74 Bypass," and the "Gaston East-West Connector." NCDOT began planning for the Gaston East-West Connector in 2001, and a formal scoping letter under NEPA was issued in April, 2003.

27.     In 2005 the project was selected by the North Carolina Turnpike Authority ("NCTA") as a candidate toll project, and in April 2006 a Notice of Intent to prepare a Draft Environmental Impact Statement ("DEIS") was issued in the Federal Register.

28.     In May 2008, NCDOT stated that it would not move forward with the project as a non-toll facility; as a result, the project could be implemented only if it could generate toll revenue.  The North Carolina Turnpike Authority then moved forward with the NEPA process for the project, assuming it would be a toll facility, and issued a Draft EIS in 2009.

29.     There has been longstanding public opposition to the project.  In 2009, more than 7,000 local citizens signed a petition in opposition to the proposed Toll Road that was submitted to NCDOT.  Polls conducted in Gaston County consistently show that more than 60 percent of voters are opposed to the road.

30.     Cost estimates for the Toll Road have varied over time, but it is now expected to cost approximately $930 million.  Less than half of this cost will be covered by toll revenue; the remainder is anticipated to be covered by an annual appropriation of $35 million per year for up to 40 years from the State of North Carolina, so-called "gap funding".  N.C. GEN. STAT. § 136‑176 (b2).

31. In the 2011 and 2012 budgets, the North Carolina Legislature removed all "gap funding" for the project. N.C. Sess. Law 2012-142.

32. Elections in Gaston County for seats in the North Carolina General Assembly have been heavily influenced by candidates' positions on the proposed Toll Road. Several candidates opposing the project have been elected in recent years and candidates who have supported the Toll Road have been defeated, such that the vast majority of the Gaston County delegation now opposes the project.

33. NCDOT has submitted applications for funding under the federal Transportation Infrastructure Finance and Innovation Act three times for the project, and the applications have been rejected each time.

34. NCDOT published its transportation plan for the next 30 years in August, 2012. The plan illustrates that the Department is facing a serious funding shortfall for transportation projects and thus will not have extra money available for the Toll Road.

<u>**Administrative Background**</u>

35. The transportation agencies published the Draft EIS ("DEIS") for the Toll Road on April 24, 2009.

36. The Conservation Groups submitted comments on the DEIS on July 21, 2009, detailing that the document was fundamentally inconsistent with NEPA due to its failure to examine feasible alternatives and environmental impacts adequately.

37. Numerous members of the public and local groups also submitted their concerns to the transportation agencies. Many more comments in opposition to the Toll Road than comments in favor were submitted by the public.

38.     Federal and State resource agencies, including the U.S. Environmental Protection Agency ("EPA"), the US Fish and Wildlife Service ("USFWS"), the U.S. Army Corps of Engineers ("Corps)", the N.C. Division of Water Quality ("DWQ"), and the N.C. Wildlife Resources Commission ("WRC") all submitted comments raising significant concerns about the consideration of alternatives, the ability of the project to meet the stated purpose and need, and the sufficiency of the analysis of environmental impacts presented in the DEIS.

39.     On December 21, 2010, the transportation agencies published a Final EIS ("FEIS") for the project.  The FEIS included some new analysis, including an analysis of quantitative indirect and cumulative impacts, and some updated traffic forecasts.  However, the new document failed to address the majority of the concerns expressed by the public, including the Conservation Groups, and by state and federal resource agencies.

40.     On February 22, 2011, the Conservation Groups submitted comments on the FEIS, restating concerns raised in the initial comments and detailing additional concerns about the integrity of the analysis of indirect and cumulative impacts, the analysis of environmental justice populations, the traffic forecasts used to analyze alternatives, the inability of the project to meet its stated purpose, and the integrity of the NEPA review.

41.     Resource agencies, including EPA, DWQ, and WRC also submitted comments on the FEIS that expressed a number of concerns, such as the failure of the transportation agencies to respond to the resource agencies' initial concerns, the failure to adequately analyze environmental impacts, the failure to present mitigation options, and the failure to address environmental justice impacts.

42.     On December 22, 2011, after learning additional information about the proposed highway project and its environmental review process, the Conservation Groups submitted

additional comments to the transportation agencies and urged NCDOT to withdraw the ROD for the project.  The Conservation Groups noted the increasing opposition to the project in the State Legislature and among the public.  The Conservation Groups also asked the transportation agencies to reconcile their economic study, which predicted virtually no induced growth, with a more recent economic study, commissioned by local officials, which predicts significant growth and development as a consequence of the proposed Toll Road.

43.    Despite the concerns of the Conservation Groups and federal and state resource agencies and the overwhelming public opposition to the project, FHWA issued a Record of Decision ("ROD") for the Gaston East-West Connector on March 1, 2012.

44.    On May 3, 2012, the United States Court of Appeals for the Fourth Circuit issued a unanimous opinion invalidating FHWA's and NCDOT's environmental analysis for a similar Charlotte area toll highway.  The flawed methodologies struck down by the Court were in substance the same, and in some places identical, to the methodologies used to analyze impacts and alternatives for the Gaston East-West Connector. The entire Court of Appeals rejected NCDOT's request for a rehearing of the decision.  FHWA did not seek a rehearing.  Neither agency sought further review.

45.    Subsequent to the Fourth Circuit ruling, on June 1, 2012, the Conservation Groups wrote a letter to FHWA asking it to withdraw the ROD for the Gaston East-West Connector and prepare a Supplemental Environmental Impact Statement for the Toll Road to take account of the recent ruling of the United States Court of Appeals.  The Conservation Groups subsequently sent this letter to NCDOT on June 15, 2012, and asked for a meeting to discuss the project.

46.     On August 13, 2012, the Conservation Groups again contacted FHWA with new information calling into question the EIS analysis and conclusions for the Toll Road. The Conservation Groups asked FHWA to withdraw the ROD for the Toll Road and to produce a Supplemental EIS to take account of new census data, which show dramatic slowing of the growth rate in Gaston County, and new financial constraints and political opposition that make it unlikely that the project will be able to be constructed in the form approved as the preferred alternative in the FEIS.

47.     The transportation agencies have not responded to these communications and have not supplemented the FEIS.

## The Environmental Impact Statement
## Alternatives Analysis

48.     In July, 2002, state and federal resource and transportation agencies first agreed on a statement of purpose and need for the proposed Toll Road. The stated needs for the road were 1) to improve mobility, access and connectivity within southern Gaston county and between southern Gaston County and Mecklenburg County; 2) to reduce congestion and improve traffic flow on area roadways, including I-85, US 29-74 and US 321; and 3) to improve high-speed, safe, regional travel, generally to improve safety, and to reduce above-average accident rates in the study area.

49.     In October 2008, NCTA published a final updated statement of purpose and need for the project that did not include the safety rationale, but left the other two stated needs intact. The revised statement of purpose and need was used in the DEIS and formed the basis for the selection of alternatives studied in that document.

*Congestion Relief*

50.     The FEIS cites improving congestion on area roadways as a primary need for the Toll Road.

51.     Further, NCDOT repeatedly defers to the long-range transportation plan of the Gaston Urban Area Metropolitan Planning Organization ("GUAMPO") as indicating a need for the Toll Road.  This plan states that the purpose of the Toll Road is to serve as a bypass and a "reliever to I-85 and US 29/74."

52.     However, the traffic forecasts in the DEIS show that the Toll Road in fact would not improve congestion on area roadways, but rather, in some cases, would make congestion worse.

*Population Growth*

53.     The FEIS cites the rapidly growing population in southern Gaston County as creating a need for the project.

54.     The statement of need is based partially on GUAMPO's forecasts of future growth for 2010, 2020, and 2030.  The forecasts indicate substantial increases in population, which the transportation agencies suggest underscore the need for the project.

55.     GUAMPO's forecasts of population growth were based on calculations that assume the Toll Road is built, and thus, that include population growth that will occur because of its construction.  Thus the forecasts of growth cited to justify the Toll Road already assume its existence.

*Mobility and Connectivity*

56.     The FEIS cites the need for increased mobility and connectivity between southern Gaston County and Mecklenburg County as a purpose for the Toll Road.

57. The DEIS provides no data to support the need for increased connectivity between the two areas. Nowhere does the DIES explain why five rather than four bridges across the Catawba River are necessary for connectivity.

58. In 2010, due to funding constraints, the plan for construction of the Toll Road was changed so that five miles would be a two-lane highway. This change was not indicated in the FEIS.

59. In meetings with resource agencies in 2011, NCDOT officials conceded that the two-lane highway would not meet the project purpose and need.

60. NCDOT has offered no explanation as to how, in the end, the four- lane highway necessary to meet the stated purpose and need would be constructed.

61. The current financial picture for the Toll Highway offers no indication that there will be funding for the four-lane highway. Applications for federal loans have been rejected three times for the project; NCDOT is currently experiencing a significant funding shortfall, which there is currently no plan to address; and the North Carolina General Assembly cut appropriated funding for the Toll Road in 2011 and 2012.

*Alternatives Screening*

62. The FEIS used a screening process to eliminate alternatives, which led to the premature elimination of a number of alternatives to a new location Toll Road.

63. In 2004, prior to the publication of the Notice of Intent to begin the NEPA process, the transportation agencies rejected all alternatives to a new location Toll Road, including improvements to existing roadways, Traffic Demand Management and Traffic System Management alternatives, and mass transit and multi-modal alternatives.

64. All alternatives to the construction of a new location Toll Road were rejected as failing to the meet the project's purpose and need.

65. Mass transit and other multi-modal alternatives were also determined to be cost-prohibitive; however, no analysis of the cost of such alternatives was included in the EIS.

66. Ultimately, just twelve slight variations of two possible alignments for a new location, controlled-access Toll Road were carried forward for the alternatives analysis.

### Traffic Forecasts

67. The statement of purpose and need and the analysis of alternatives in the EIS were based on a series of traffic forecasts.

68. The EIS included forecasts of traffic on roadways in the study area for base year (2006) and for two future year (2030) scenarios. The two 2030 scenarios were (1) a future in which the Toll Road is constructed, the "Build" scenario, and (2) a future in which the Toll Road is not constructed, the "No Build" scenario.

69. The "No Build" traffic forecast for 2006 was significantly greater than actual observed traffic counts for that year.

70. Both the "Build" and "No Build" forecasts were based on the Metrolina Regional Travel Demand Model ("MRM"), just as for the Monroe Connector/Bypass.

71. The MRM assumed the existence of the Gaston East-West Connector. Thus, just as with the Monroe Connector/Bypass, both "Build" and "No Build" forecasts were premised on the same set of underlying socio-economic data, which assumed construction of the Toll Road.

72. The Conservation Groups questioned the inflated traffic forecasts and the use of the MRM for both the "Build" and the "No Build" scenarios in their comments on the DEIS.

73.     In the FEIS, the transportation agencies updated their forecasts of future traffic to a 2035 horizon year, using an updated version of the MRM.  However, they continued to base both "Build" and "No Build" traffic forecasts on a single set of socio-economic data from the MRM.

74.     It is undisputed that the MRM, and thus both the "Build" and "No-Build" traffic forecasts, were based on a single set of socio-economic data, and defendants so stated in the FEIS.  That set of data, again, assumed the existence of the Toll Road.  The transportation agencies further acknowledged that travel demand modeling is a function of socioeconomic conditions.

75.     Nonetheless, the transportation agencies contended that the use of the MRM and a single set of socioeconomic data for both "Build" and "No Build" forecasts was a standard and reasonable practice.  The FEIS contains no forecast of traffic in the absence of the new Toll Road.

76.     The transportation agencies thus acted arbitrarily and capriciously by comparing "Build the Road" to "Build the Road" in evaluating alternatives.

## Indirect Impacts

77.     In response to NCDOT's 2003 scoping letter, state and federal agencies commented that they had substantial concerns about indirect and cumulative impacts that would occur as a result of the growth the new Toll Road would induce, noting particularly the impacts to water quality in the region.  Those agencies asked that the indirect impacts be studied in detail.

78.     NCTA responded that indirect and cumulative effects would be fully studied in the EIS.

79.     In 2009, NCDOT prepared a Qualitative Indirect and Cumulative Effects analysis, which was published as part of the DEIS.

80.     After resource and permitting agencies commented that the qualitative analysis was insufficient, NCDOT contracted with a consultant to prepare a Quantitative Indirect and Cumulative Effects ("ICE") analysis.

81.     The quantitative analysis adopted forecasts of a future with the Toll Highway for the "Build" scenario. For the "No Build" scenario, the agencies simply assumed that any growth in the region was not attributable to the Toll Road and thus kept the level of growth the same. It did not attempt to prove or establish that conclusory assumption with any facts or data.

82.     The quantitative analysis thus compared "Building the Road" to "Building the Road."

83.     After concerns were raised that state and federal resource agencies would not accept this assumption, much of the explanation of methodology was deleted from the study. However the methodology itself and the subsequent analysis and conclusions remained in place.

84.     The ICE study was published in the FEIS and concluded that there would be very little change in growth and development patterns attributable to the Toll Road. The study showed a net loss of employment opportunities as a result of construction, a negligible increase in development and impervious surfaces, and accordingly negligible environmental impacts.

85.     Subsequent to the publication of the FEIS and ICE study, the Gaston Chamber of Commerce commissioned an economic study by Dr. John Connaughton, which reached a conclusion opposite to that presented in the FEIS. The Gaston Chamber study concluded that the Toll Road would dramatically increase development in the study area and would increase population in Gaston County by up to 29,230 individuals, compared to a No-Build scenario.

86.     After the Gaston Chamber study and its conclusions were disseminated to the public and the media, the Conservation Groups asked NCDOT to explain the difference in conclusions reached by the two studies.

87.     NCDOT offered no explanation regarding the difference between the studies until the publication of the Record of Decision.  As part of the ROD document, the transportation agencies stated that the two studies had different purposes, uses, and methodologies.  The transportation agencies declined to explain why the two studies reached such divergent conclusions.  Nor did the transportation agencies explain why it made any difference that one study was prepared for an environmental review under NEPA and the other was prepared to determine the economic consequences of the Toll Road for a public economic development organization.  In both instances, the goal of the studies was to determine whether the Toll Road would induce growth and, if so, how much.

88.     In resolutions and statements regarding the purported need for the road, numerous public officials and municipalities–including Gaston County, the Gaston Regional Chamber, and the Town of Cramerton–cite growth and increased employment opportunities as the primary justification for the Toll Road.  The Gaston County Board of Commissioners has referred specifically to Dr. Connaughton's study to illustrate its reasons for supporting the project.  These resolutions were cited in the FEIS as creating a purpose and need for the project.

89.     Representatives from NCDOT continue to refer to the Gaston Chamber study in their public statements regarding the Toll Road.  For example, a Board member for the North Carolina Turnpike Authority has defended the Gaston Chamber study, with its forecasts of increased population and development, to members of the public and indicated that, if anything, it is the transportation agencies' own EIS that has deficiencies.

90.     The Gaston Chamber study has also been presented to the Governor and to local legislators by supporters of the Toll Road who are in regular contact with NCDOT.

91.     In sum, the transportation agencies have presented an arbitrary and capricious analysis to the public about both the need for the Toll Road and the expected impacts from the Toll Road — just as they did with the Monroe Connector/Bypass.

## Cumulative Impacts

92.     The Charlotte Intermodal Transportation Facility ("Intermodal Facility") is a new freight facility planned to be located at the Charlotte Douglas International Airport close to the new Toll Road.

93.     The Gaston Urban Area Metropolitan Planning Organization ("GUAMPO") has stated in a resolution that the Gaston East-West Connector will be a major contributor to the Intermodal Facility.  GUMAPO believes the two projects combined will be an economic asset to the region and the State of North Carolina.

94.     The FEIS cites the Intermodal Facility as justifying the need for the Toll Road.

95.     Despite the predicted growth that will be occasioned by the combination of the Toll Road and the Intermodal Facility, the Quantitative ICE study fails to analyze the cumulative impacts of the two projects.

## Direct Impacts

96.     The Draft Environmental Impact Statement included a cursory review of a number of direct environmental impacts.

97.     The Conservation Groups and state and federal resource agencies submitted comments on the DEIS asking for additional analysis of environmental impacts, including air quality, water quality, wildlife, and environmental justice impacts.

98.     The transportation agencies failed to provide an analysis about how different alternatives would impact water quality, and failed to document any degradation to Clean Water Act § 303(d)-listed streams.  Defendants refused to address these concerns and instead stated that detailed review would be performed at the permitting stage, but not as part of the NEPA process.

99.     The transportation agencies failed to provide an analysis about how different alternatives would impact air quality, including levels of smog and Mobile Source Air Toxics ("MSATs").  The FEIS fails to document how different populations who have an elevated risk from MSATs would be affected by the Toll Road.

100.    The transportation agencies failed to provide an analysis of the impacts of various alternatives would impact environmental justice communities.

101.    The selected alternative will result in one of the highest levels of relocations of minority communities compared to all considered alternatives, including the relocation of the Myrtle School community, a community of predominantly low-income, African American women, their children, and grandchildren.  Further, the Toll Highway will not serve low-income populations, who will not be able to afford to use it regularly.

102.    Rather than perform the required analysis of environmental justice communities, the FEIS states that environmental justice communities will benefit from the Toll Road because it will reduce congestion on area roadways − ignoring the fact that estimates in the FEIS show no improvement in congestion on area roadways.

103.    The transportation agencies failed to provide an analysis about how different alternatives would affect area wildlife.  For example, the Bog Turtle has been labeled a species of special concern by the USFWS.  However, despite the presence of Bog Turtle habitat in the

project area, the FEIS fails to document impacts that different alternatives would have on turtle populations.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF:

## Defendants Arbitrarily and Capriciously Failed to Assess and Disclose Direct and Indirect Environmental Impacts Adequately in the FEIS

104.    The Conservation Groups incorporate the allegations of paragraphs 1-103 as if set forth in full.

105.    NEPA requires, among other things, that federal agencies prepare a detailed EIS on every proposal for major federal action that may "significantly affect the quality of the human environment." NEPA § 102(2)(C), 42 U.S.C. § 4332(2)(C). The EIS must include the specific information required by the NEPA regulations of the Council on Environmental Quality, which are binding on all federal agencies. 40 C.F.R. Part 1500, et seq.

106.    NEPA further requires that every EIS must be prepared with objective good faith and must fully and fairly discuss, among other things, the adverse environmental effects of the proposed action and the alternatives to the proposed action that may avoid or minimize these adverse effects. 42 U.S.C. § 4332(2)(C) and (E).

107.    The "effects" that must be discussed in the EIS include, among other considerations, the direct environmental impacts of the proposed action, the indirect effects of the proposed action, and the cumulative impacts of the proposed action.

108.    The NEPA regulations define "direct effects" as effects "which are caused by the action and occur at the same time and place." 40 C.F.R. § 1508.8(a).

109.    The NEPA regulations define "indirect effects" as effects "which are caused by the action and are later in time or farther removed in distance, but are still reasonably

foreseeable." 40 C.F.R. § 1508.8(b). Further, indirect effects may include "growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems." 40 C.F.R. § 1508.8(b).

110. The NEPA regulations require that an EIS include discussion of the means to mitigate adverse environmental impacts. 40 C.F.R. § 1502.16 (h).

111. The NEPA regulations define "cumulative impact" as the "impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." 40 C.F.R. § 1508.7.

112. The Final EIS is arbitrary and capricious and inadequate under NEPA in at least the following respects:

    a.    The FEIS fails to adequately assess and disclose the indirect impacts of the Gaston East-West Connector, including all the induced development and associated environmental impacts that are likely consequences of constructing the new Toll Road.

        i)    The agencies arbitrarily based their analysis of indirect impacts on the fundamental assumption that transportation projects do not induce growth, thus comparing "Building the Road" to "Building the Road" in determining indirect impacts.

        ii)    The agencies failed to reconcile this fundamental assumption with numerous contradictory public statements of their own and of local

authorities and studies stating that the Toll Road would result in substantial development in the project area.

b.      The FEIS fails entirely to disclose the cumulative impact of the Toll Road and the Charlotte Regional Intermodal Facility.

c.      The FEIS fails entirely to assess and disclose the direct impact of the proposed Toll Road on water quality, air quality or wildlife.

d.      The FEIS fails to discuss the impacts of the Toll Road on Environmental Justice communities.

   i)      The selected alternative will result in one of the highest levels of relocations of minority communities of the alternatives under consideration, and will include the relocation of the Myrtle School community.

   ii)      Rather than perform the required analysis of environmental justice communities, the Draft EIS states that those communities will benefit from the road because it will reduce congestion on area roadways, contrary to some forecasts in the DEIS that the Toll Road will increase congestion on those roadways.

   iv)      Environmental Justice Communities will thus suffer from high rates of relocation, increased degradation of air and water quality, and increased traffic congestion,  while at the same timing being among the least able to afford the Toll Road.  Defendants have failed to analyze this situation as they are required to do under NEPA.

113.    The transportation agencies' failure to take a hard look at significant

environmental impacts of the proposed action in the Final EIS violates NEPA and its

implementing regulations and is arbitrary, capricious, and otherwise not in accordance with law.

## SECOND CLAIM FOR RELIEF:

### Defendants' Alternatives Analysis Was Arbitrary and Capricious and Deficient in Scope and Analysis

114.    The Conservation Groups incorporate the allegations of paragraphs 1-113 as if set

forth in full.

115.    NEPA requires that an EIS contain a statement of purpose and need for the

proposed action that "shall briefly specify the underlying purpose and need to which the agency

is responding in proposing the alternatives including their proposed action."  40 C.F.R.

§ 1502.13.

116.    NEPA requires an agency to include in an EIS a "detailed statement" of

"alternatives to the proposed action."  42 U.S.C. § 4332(2)(C)(iii).  In this statement, the agency

must rigorously explore and objectively evaluate all reasonable alternatives that could achieve

the underlying project purpose.  40 C.F.R. § 1502.14(a).

117.    This alternatives analysis is "the heart of the environmental impact statement,"

and should "present the environmental impacts of the proposal and the alternatives in

comparative form, thus sharply defining the issues and providing a clear basis for choice among

options by the decision maker and the public."  40 C.F.R. § 1502.14.  Only those alternatives that

are deemed to be unreasonable can be eliminated from the study.  40 C.F.R. § 1502.14(a).

118.    The transportation agencies failed to evaluate objectively alternatives to the

Gaston East-West Connector Toll Road.

119.    The selected alternative does not meet the stated purpose and need for the project, and thus the EIS did not provide a rational basis for selecting among alternatives.

120.    A number of reasonable alternatives, including upgrade and multi-modal alternatives, were arbitrarily rejected by the transportation agencies, in violation of NEPA.

121.    The analysis of alternatives in the EIS was based on erroneous traffic forecasts, which assumed construction of the Toll Road in both the "Build" and "No Build" scenarios, overstating the need for the future highway and limiting the consideration of reasonable alternatives.  In considering alternatives, the defendants thus compared "Build the Road" to "Build the Road."

122.    The transportation agencies' failure to analyze objectively a reasonable range of alternatives violates NEPA and its implementing regulations and is arbitrary, capricious, and otherwise not in accordance with law.

### THIRD CLAIM FOR RELIEF:

### Defendants' EIS Was Not Prepared in Good Faith and Did Not Respond to Public Comments

123.    The Conservation Groups incorporate the allegations of paragraphs 1-122 as if set forth in full.

124.    The purpose of the NEPA documents is to "serve as the means of assessing the environmental impact of proposed agency actions, rather than justifying decisions already made."  40 C.F.R. § 1502.12(g).  To this end, NEPA requires that information be made available to "public officials and citizens before decisions are made and before actions are taken."  40 C.F.R. § 1500.1(b).

125.    The CEQ regulations provide that an agency preparing a final EIS "shall assess and consider comments" on the draft EIS and "shall respond" to those comments in one of

several specified ways, including making requested modifications, corrections and supplementations. 40 C.F.R § 1503.4(a). If the agency decides the comments do not warrant further agency response, it must so declare, "citing the sources, authorities or reasons which support the agency's position." 40 C.F.R. § 1503.4(a)(5).

126. NEPA requires that every EIS must be prepared with objective good faith and professional integrity. 40 C.F.R. § 1502.24.

127. The transportation agencies violated NEPA by failing to present a true, accurate, and transparent picture of impacts and alternatives to the public and to resource agencies.

a. The transportation agencies purposefully obscured the methodology of the indirect and cumulative impacts analysis.

b. The transportation agencies "smoothed" and altered model outcomes to make them appear more politically palatable.

c. The transportation agencies failed to respond to comments asking them to reconcile their findings with diametrically opposed studies and statements.

128. The transportation agencies' failure to prepare the EIS in objective good faith and to respond adequately to comments violates NEPA and its implementing regulations and is arbitrary, capricious, and otherwise not in accordance with law.

## FOURTH CLAIM FOR RELIEF

### Defendants Failed to Prepare a Supplemental EIS in Light of New Information

129. The Conservation Groups incorporate the allegations of paragraphs 1-128 as if set forth in full.

130. NEPA regulations require that a federal agency prepare a supplement to the EIS if: 1) the agency makes substantial changes in the proposed action that are relevant to

environmental concerns, or 2) there are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts. 40 C.F.R. § 1502.9(c)(1); 23 C.F.R. § 771.130(a).

131.    The preparation of a new or supplemental EIS is required by substantial changes in the proposed action that was the subject of the Final EIS and approved in the ROD, and significant new circumstances or information since the preparation of the Final EIS.

128.    Significant new circumstances that require supplementation of the Final EIS include at least the following:

a.    The recent ruling by the United States Court of Appeals for the Fourth Circuit invalidating Defendants' use of the same methodology to analyze traffic forecasts and induced growth for a similar toll highway project in the Charlotte region.

b.    New census data which show that, contrary to statements in the EIS about the need for the Toll Road, growth in Gaston County is no longer strong.

c.    Lack of the anticipated funding for the Toll Road, including failure to secure federal loans, the loss of appropriated funding from the North Carolina Legislature, and an assessment of NCDOT's financial means that discloses a severe funding gap. These changes mean that the project may not be able to be funded at all, but at the very least demonstrate that five miles of the project will be constructed as a two-lane road that fails to meet the project purpose and need.

d)    Continued reliance by local officials and NCDOT personnel on the Gaston Chamber Economic Study to justify construction of the project. That study directly contradicts findings in the EIS that the Toll Road will not result in additional growth.

129.     Based on the substantial changes in the proposed action and the significant new information since the issuance of the Final EIS, as described above, the transportation agencies' failure to prepare a Supplement to the EIS violates NEPA and its implementing regulations and is arbitrary and capricious and otherwise not in accordance with law.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs respectfully request that this Court:

1.     Enter a declaratory judgment that defendants violated the National Environmental Policy Act by preparing an inadequate FEIS;

2.     Vacate the Record of Decision for the challenged project;

3.     Grant appropriate preliminary and permanent injunctive relief to ensure that defendants comply with the National Environmental Policy Act, and specifically to ensure that defendants take no further actions toward proceeding with the challenged Gaston East-West Connector until they have complied with NEPA;

4.     Award the Conservation Groups the costs of this action, including their reasonable attorneys' fees; and

5.     Grant such other relief as the Court deems just and proper.

Respectfully submitted this 28th day of August, 2012

S/Frank S. Holleman III
Frank Holleman – NC Bar No. 43361

S/Kimberley Hunter
Kimberley Hunter – NC Bar No. 41333

SOUTHERN ENVIRONMENTAL LAW CENTER
601 West Rosemary Street, Suite 220
Chapel Hill, North Carolina 27516-2356
Telephone: (919) 967-1450
Facsimile:  (919) 929-9421
fholleman@selcnc.org
khunter@selcnc.org

*Attorneys for Plaintiffs*