IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:12-cv-559-RJC-DCK

| | |
|---|---|
| CATAWBA RIVERKEEPER FOUNDATION and CLEAN AIR CAROLINA, | ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) ) |
| NORTH CAROLINA DEPARTMENT OF TRANSPORTATION, ANTHONY J. TATA, SECRETARY, NCDOT, FEDERAL HIGHWAY ADMINISTRATION, and JOHN F. SULLIVAN, DIVISION ADMINISTRATOR, FHWA, | ) ) ) ) ) ) ) ) |
| Defendants. | ) ) |

**ORDER**

**THIS MATTER** is before the Court, *sua sponte*, to transfer venue of this case to the Eastern District of North Carolina so that it may proceed before the Honorable James C. Dever, III.

## I. BACKGROUND

This is an environmental challenge to the construction of the Gaston East-West Connector, a proposed 22 mile toll road that would "run from I-85 west of Gastonia to I-485 near the Charlotte-Douglas Airport." (Doc. No. 33 at 1). Plaintiffs contend that Defendants violated the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.* ("NEPA"), in preparing the Environmental Impact Statement ("EIS") and issuing the Record of Decision ("ROD"). Specifically, the Complaint alleges that Defendants erroneously "compared 'building the road' to 'building the road'" in their environmental analysis. (*Id.* at 3).

Plaintiffs' Complaint ("*Garden Parkway*"), filed on August 28, 2012 contains four separate claims for relief. (Doc. No. 1 at 21-28). Viewed from the perspective of the Plaintiffs' attorneys, the complaint is remarkably similar in content, claims for relief, legal theory, and case history as the complaint they filed in *N.C. Wildlife Fed'n v. N.C. DOT*, 3:14-cv-338-GCM (W.D.N.C.) ("*Wildlife II*"), (Doc. No. 1). That complaint was filed in the Western District of North Carolina on June 23, 2014 and recently transferred to the Eastern District of North Carolina by Order dated November 14, 2014. (*Id.*, Doc. No. 27).

That lawsuit in turn followed an earlier challenge filed on November 2, 2010 in the Eastern District of North Carolina. *See N.C. Wildlife Fed'n v. N.C. DOT*, No. 5:10-cv-476-D (E.D.N.C.) ("*Wildlife I*"). The district court in *Wildlife I* found in favor of Defendants, ruling that the Monroe Connector complied with NEPA. *Wildlife I*, No. 5:10-cv-476-D, 2011 WL 5042075 *1, *17 (E.D.N.C. Oct. 24, 2011). Following Plaintiffs' appeal, the United States Court of Appeals for the Fourth Circuit vacated the district court's judgment and remanded the matter "so that the Agencies and the public can fully (and publicly) evaluate the 'no build' data." *N.C. Wildlife Fed'n v. N.C. DOT*, 677 F.3d 596, 605 (4th Cir. 2012) ("*Wildlife IA*").

Instead of litigating the remand before Judge Dever, Plaintiffs brought *Wildlife II* in the W.D.N.C. Counsel in *Wildlife I & II* and *Garden Parkway* are the same. In filing *Wildlife II,* counsel did not file a related case notice.[1] Nor did they indicate to this Court that a case had been filed in Judge Mullen's court, even when specifically asked about the remand status of

---

[1] In their initial filings of *Wildlife II*, Plaintiffs had the opportunity to notify the court of any related cases filed in the W.D.N.C. The W.D.N.C. provides a *Civil Case Opening Guide* that instructs parties on filing a civil complaint and other initiating documents. In the Guide parties are instructed to provide information regarding related cases. *See Civil Case Opening Guide* at 2-3. The related case check box was not checked when *Wildlife II* was opened.

2

*Wildlife I* and its litigation history during the hearing on November 21, 2014. [2] As a result Judge Mullen issued a transfer Order on November 14, 2014 without full knowledge of *Garden Parkway* before this Court. Likewise this Court conducted a hearing on November 21, 2014 without knowledge of the recently transferred action in Judge Mullen's court.

This complex course of litigation is best simplified in a graph. If the litigation were graphed as originally filed it would appear as such:

| *Wildlife I*<br>5:10-cv-476-D<br>Filed: November 2, 2010<br><br>EDNC<br>Judge Dever | *Garden Parkway*<br>3:12-cv-559-RJC<br>Filed: August 28, 2012<br><br>WDNC<br>Judge Conrad | *Wildlife II*<br>*3:14-cv-338-GCM*<br>Filed: June 23, 2014<br><br>WDNC<br>Judge Mullen |
|---|---|---|

As a result of Judge Mullen's Order to transfer, the litigation grouped accordingly:

| *Wildlife I*<br>*Wildlife II*<br><br>EDNC<br>Judge Dever | *Garden Parkway*<br><br>WDNC<br>Judge Conrad |
|---|---|

---

[2] The Court tried without much success to learn more about the post-remand litigation activity in the case. After a series of opaque answers to the Court's questions, the fact that *Wildlife II* had been filed in this district, assigned to Judge Mullen and subject to a transfer Order was not revealed:

The Court:      And so what – on remand what is the status?
Ms. Hunter:    So the agencies went back and revisited their analysis that was – that case was in May of 2012 when it came down and they spent maybe a year and a half revisiting their analysis and published a new record of decision earlier this year.
The Court:      And so in terms of the litigation histories since remand?
Ms. Hunter:    And so the plaintiffs in that case challenged that new record of decision.
The Court:      In the same case?
Ms. Hunter:    Well, it's a new case. But, yes, Your Honor.

Oral Argument Transcript, November 21, 2014, 3:12-cv-559-RJC, at 10-11.

3

As a result of the instant Order, the litigation graph will look like this:

```
┌─────────────────────┐
│    Wildlife I       │
│    Wildlife II      │
│   Garden Parkway    │
│                     │
│                     │
│    EDNC             │
│    Judge Dever      │
└─────────────────────┘
```

Taking Plaintiffs at their word, *Wildlife I & II* and *Garden Parkway* are "duplicate" cases. (Doc. No. 33 at 39). Plaintiffs repeatedly equated this *Garden Parkway* action to the *Wildlife* actions in their complaint, summary judgment briefing, and again in oral arguments:

> The United States Court of Appeals for the Fourth Circuit recently invalidated defendants' NEPA review for a **similar** toll highway proposal, the Monroe Connector/Bypass. N.C. Wildlife Fed'n v. N.C. DOT, 677 F.3d 596 (4th Cir. 2012) (*Wildlife IA*).[3]

> In its decision, the Fourth Circuit condemned the NEPA analysis for the Monroe Connector/Bypass in which defendants – the **same** defendants as in the present action – compared "building the road" with "building the road" in their impacts and alternatives analysis, and were not candid with the public and state and federal resource agencies. Defendants' analysis for the Gaston East-West Connector is infected with the **same** arbitrary and capricious analysis.[4]

> Fourth, defendants failed to supplement the Environmental Impact Statement to address significant developments since the EIS was originally issued including the recent ruling by the United States Court of Appeals for the Fourth Circuit that invalidated their **similarly flawed** analysis for the proposed Monroe toll highway;…[5]

> On May 3, 2012, The United States Court of Appeals for the Fourth Circuit issued a unanimous opinion invaliding FHWA's and NCDOT's environmental analysis for a **similar** Charlotte area toll highway. The flawed methodologies struck down by the Court

---

[3] Doc. No. 1 at 2 (emphasis added).
[4] *Id.* (emphasis added).
[5] *Id.* at 4 (emphasis added).

4

were in substance the **same**, and in some places **identical**, to the methodologies used to analyze the impacts and alternatives for the Gaston East-West Connector.[6]

The MRM assumed the existence of the Gaston East-West Connector. Thus, just as with the Monroe Connector/Bypass, both "Build" and "No Build" forecasts were premised on the **same set** of underlying socio-economic data, which assumed construction of the Toll Road.[7]

Subsequent to the Fourth Circuit ruling, on June 1, 2012, the Conservation Groups wrote a letter to FHWA asking it to withdraw the ROD for the Gaston East-West Connector and prepare a Supplemental Environmental Impact Statement for the Toll Road to take account of the recent ruling of the United States Court of Appeals (*Wildlife IA*).[8]

Significant new circumstances that require supplementation of the Final EIS include at least the following: a. The recent ruling by the United States Court of Appeals for the Fourth Circuit invalidating Defendants' use of the **same** methodology to analyze traffic forecasts and induced growth for a **similar** toll highway project in the Charlotte region.[9]

Supplementing the Complaint's linkage of *Garden Parkway* and *Wildlife I & IA*, the summary judgment briefing continually argue the same point:

> Just last year, in N.C. Wildlife Federation v. N.C. DOT, the Fourth Circuit found that the **same** Defendants had once more violated NEPA in their review of the Monroe Bypass, another proposed Charlotte-area toll highway. 677 F.3d 596 (4th Cir. 2012)… Among other errors, these Defendants again compared "building the road" to "building the road." The Court strongly rebuked these **same** Defendants and remanded the EIS back for reevaluation.[10]

> The EIS for the Connector and for the Monroe Bypass were drafted by the **same** people and at the **same** time, both under the purview of NCTA. **Meetings were held to jointly discuss the two projects with the same consultants, engineers and agency representatives**. Not surprisingly, the analysis of the two projects contain the **same** flaws. Both projects are the results of the **same** schizophrenic transportation planning process.[11]

> The Conservation Groups, as in N.C. Wildlife Federation, seek transparency and truthfulness…The current EIS does none of these, but instead compares "building the

---

[6] *Id.* at 11 (emphasis added).
[7] *Id.* at 15 (emphasis added).
[8] *Id.* at 45.
[9] *Id.* at 27 (emphasis added).
[10] Doc. No. 33 at 2 (emphasis added).
[11] *Id.* (emphasis added).

5

road" with "building the road." Defendants' ROD is based on the arbitrary and inconsistent analysis – **just as it was** for the Monroe Bypass. [12]

Again, **just as they had done** with the Monroe Bypass, by comparing "building the road" to "building the road," Defendants were able to show that a new highway connecting through the Charlotte outskirts would produce minimal growth or development… And, indeed, the basic assumption underlying the model – that the project will not bring new growth to the region, but rather will just redistribute where the expected growth goes – was the **same** assumption, condemned by the Fourth Circuit, used to calculate the impacts of the Monroe Bypass. [13]

Defendants' error was the result of the **exact same** methodology used to calculate traffic forecasts for the Monroe Bypass. "The toll modeling methodology developed for the US-74 Monroe Connector (R-3329) DSA is also used for this study." AR 53476. [14]

As a result, **just as they did** in their analysis of the Monroe Bypass, Defendants presented an analysis in their EIS which showed that construction of a 22-mile new-location toll highway, which includes a major new crossing of the Catawba River and an important segment adjacent to an expanding international airport, would have so little impact on growth that it would actually lead to job losses in the study area. [15]

**In both cases**, Defendants engaged in a fundamentally flawed analysis, knew they were doing it, and kept that defect from the public. [16]

**Just as** Defendants obscured key information from the public in their analysis of the Monroe Bypass, Defendants again obliterated NEPA's "informational role" in their analysis of the Connector. [17]

**Just as they did** for the Monroe Bypass, here Defendants created bogus baseline data to study alternatives to the Connector *and* to study the Connector's impacts. [18]

---

[12] *Id.* at 3 (emphasis added). The "transparency and truthfulness" statement is glaring in light of a litigation record lacking the same. Plaintiffs filed three causes of action in different district courts and did not adequately apprise any judge of that fact. Plaintiffs further alleged, "This is the third time these same Defendants have come into federal court violating NEPA with a process tailor-made to support their preferred outcome," (Doc. No. 33 at 11), citing, in addition to *Wildlife I*, the M.D.N.C. case of *N.C. Alliance for Transportation Reform v U.S. Dep't of Transp.*, 151 F. Supp. 2d 661 (M.D.N.C. 2001). In brief and at argument, counsel argued that "the Middle District of North Carolina found that Defendants violated NEPA in examining the alternatives and impacts for the Winston Salem Bypass when they compared 'building the road' to 'building the road.' 151 F. Supp. 2d 661 (M.D.N.C. 2001)." (Doc. No. 33 at 1). Inexplicably, in light of that argument, counsel failed to mention the subsequent district court holding, to which no appeal was taken, that the defendants complied with NEPA. *See N.C. Alliance for Transportation Reform v. U.S. Dep't of Transp.*, 713 F. Supp. 2d 491, (M.D.N.C. May 2010).
[13] *Id.* at 11-12 (emphasis added).
[14] *Id.* at 20 (emphasis added).
[15] *Id.* at 30 (emphasis added)
[16] *Id.* at 39 (emphasis added).
[17] Doc. No. 41 at 3 (emphasis added).
[18] *Id.* at 13 (emphasis added).

Here, Defendants have attempted to avoid the clear application of the Fourth Circuit's two recent rulings by emphasizing that while their alternative analysis was identical to that performed for the Monroe Bypass, their impacts analysis was distinct…In both analyses, **the fundamental assumption was the same**: The highway would not bring new growth to the region.[19]

But the no-growth assumption upon which Defendants based their methodology has no "rational basis," and is **exactly the baseless assumption** rejected by the Fourth Circuit for a neighboring geographic area. [20]

Lastly, Plaintiffs once again advanced the assertion that *Garden Parkway* and *Wildlife* are duplicate matters at oral argument on November 21, 2014:

The Monroe bypass was being analyzed by the **same** consultants and the **same** staff… [as the case] currently before Your Honor, the Gaston East-West Connector. So in that way many of the **same** methodologies were used, and those methodologies were at least partially overturned by the Fourth Circuit and the North Carolina Wildlife Federation.[21]

We believe that ultimately all of our claims in this case come down to a failure to disclose. And there are **very similar** failures of disclosures in this case as there were in that case [the *Wildlife* case].[22]

For the alternatives analysis, we believe that the error [of the baseline data] was **identical** [between this case and the *Wildlife* case]. For the impacts analysis, we believe that…while the methodology was slightly different, the underlying error was the **same**. More importantly what we have in this case that makes it **identical** to the *North Carolina Wildlife Federation* case, is again, a failure to disclose the flaw in the no build data to the public.[23]

Plaintiffs' Complaint in *Garden Parkway* is also similar in content, claims for relief, and legal theory as the Complaint they filed in *Wildlife I & II*. Similar parties are involved in *Garden Parkway* and *Wildlife I & II* and the attorneys are the same. Although *Garden Parkway* is a separate toll road, the facts surrounding this case, the methodologies utilized, and the substantial administrative record are similar to *Wildlife I & II*. Plaintiffs assert nearly identical claims for relief in *Garden Parkway* and *Wildlife I & II*, which focus on similar criticisms of non-

---

[19] *Id.* at 20-2 (emphasis added).
[20] *Id.* at 22 (emphasis added).
[21] Oral Argument Transcript, November 21, 2014, 3:12-cv-559-RJC, at 6 (emphasis added).
[22] *Id.* at 7 (emphasis added).
[23] *Id.* at 13 (emphasis added).

7

compliance of the NEPA process, most importantly the "build to build" criticism. Plaintiffs in *Garden Parkway* and *Wildlife II* both repeatedly rely on *Wildlife IA* in their respective motions and briefs to support their legal claims. Based upon the similarities between Plaintiffs' Complaints filed in both actions and Plaintiffs' repeated assertions equating *Garden Parkway* and *Wildlife* in their Complaint, summary judgment briefing, and oral argument, this Court takes Plaintiffs at their word which establishes that *Garden Parkway* and *Wildlife I & II* are parallel cases.

## II. LEGAL STANDARD

Title 28, United States Code, Section 1404(a) provides, in part: "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought . . . ." *See also Atl. Marine Constr. Co., Inc. v. U.S. Dist. Court*, 134 S. Ct. 568, 581 (2013). Congress designed Section 1404(a) as a "federal judicial housekeeping measure" to "prevent the waste of time, energy, and money and to protect litigants, witnesses and the public against unnecessary inconvenience and expense." *Van Dusen v. Barrack*, 376 U.S. 612, 636 (1964).

A district court judge may *sua sponte* consider transfer. *Feller v. Brock*, 802 F.2d 722, 731, n.7 (4th Cir. 1986) (suggesting that on remand district court consider transfer to avoid conflict between coordinate courts). *Robinson v. Town of Madison*, 752 F. Supp. 842, 846 (N. D. Ill. 1990) (court's authority to transfer cases under 28 U.S.C. § 1404(a) does not depend on a motion, stipulation or consent of the parties). [24]

---

[24] Normally, a court considering *sua sponte* transfer of venue might request briefing. *Moore v. Rohm & Haas Co.*, 446 F.3d 643, 647 (6th Cir. 2006). Here, Plaintiffs were given ample opportunity to brief transfer after *Wildlife II* was filed in the W.D.N.C. (3:14-cv-338-GCM, Doc. No. 17: Response to Motion to Change Venue; Doc. No. 27: Order granting Motion to Change Venue). Judge Mullen's Order in that case comprehensively assesses the transfer factors in a parallel situation. The reasoning there is as compelling in this case as it was in *Wildlife II*. Finally, Plaintiffs forfeited consideration they might otherwise have been granted by failing to adequately disclose the

## III. DISCUSSION

Judge Mullen issued a comprehensive analysis, after briefing, of the Section 1404(a) transfer factors in *Wildlife II*. There, he found that the lawsuit could have been brought in the Eastern District of North Carolina because it was the residence of individual defendants including one person, John Sullivan, who is also a defendant in the instant action. Judge Mullen weighed other factors in favor of transfer concerning matters that are equally present here, including the place of business for Defendant N.C. DOT and the N.C. Division of FHWA, and where a substantial part of the work and analysis done on the ROD occurred. (*Wildlife II*, 3:14-cv-338-GCM, Doc. No. 27 at 3). He then went on to apply the eleven factor transfer test and found that test weighed in favor of transfer. *See Am. Motorists Ins. Co. v. CTS Corp.*, 356 F. Supp. 2d 583, 585 (2005). This court will rely on, without reiterating in exact detail, Judge Mullen's cogent assessment.

For the reasons stated in that opinion, incorporated herein, and for the further reasons that follow, transfer is warranted.

**Judicial Economy**

Judge Mullen found that the Eastern District court's intimate familiarity with the subject matter and its positional advantage in evaluating whether Defendants complied with the Fourth Circuit's directives in *Wildlife IA* strongly supported transfer. (*Wildlife II*, 3:14-cv-338-GCM, Doc. No. 27 at 5). Judge Mullen reached this decision even though Defendants argued that, since *Wildlife I*, approximately four years of new facts, including 367 new exhibits, two new environmental documents and entirely new expert analysis and legal claims existed. (*Id.* at 5). Judge Mullen found that "substantial efficiencies" would result from transfer:

---

existence of parallel cases in this district to both the undersigned and Judge Mullen. Given the unique circumstances of this case, and the delay that further briefing would entail, notice and briefing is not warranted prior to ruling.

9

> Certainly, this new challenge addresses many new facts and analyses that will prove central to resolving this dispute. But the Court agrees with Defendants that "a material portion of [the] current record derives from the information already reviewed by the Eastern District." (Doc. No. 19 at 3). For example, Defendants note that much of the Supplemental Final EIS challenged in this suit contains charts and analyses describing how conditions have changed since 2010, and indicate whether those changes altered the conclusions in the original EIS. (*Id.*). Moreover, after reviewing new data, NCDOT ultimately concluded that "in almost all cases . . . the underlying conclusions and methodologies based on the original 30,683-page record remain valid." (*Id.* at 4). Thus, an understanding of the prior studies is essential to evaluating the claims here. The mere fact that these are supplemental analyses highlights the necessity of understanding the original analyses. For these reasons, the Court finds that the eighth factor [judicial economy] weighs heavily in favor of transfer.

(*Id.* at 6-7).

Although this is a separate toll road project with its own extensive administrative record, the process criticisms are the same. Indeed, rarely does parallel litigation involve such an overlap of facts, parties, attorneys, legal theory and asserted controlling circuit precedent. Plaintiffs' "build to build" criticism, and their repeated reliance on *Wildlife IA* in both *Wildlife II* and *Garden Parkway* warrant assessment of that critique in the same forum. Plaintiffs weave and re-weave their arguments about NEPA non-compliance around and through *Wildlife IA* to such an extent that pulling the threads apart is attempting to untie the ancient Gordian knot.

Plaintiffs' core objection that Defendants failed in their NEPA compliance by comparing "building the road" to "building the road" is central to its claims here as it is in *Wildlife II*. Defendants dispute this challenge in strong terms and attempt to distinguish their conduct in *Garden Parkway* from what was found flawed by the Fourth Circuit in *Wildlife IA*. But the dispute runs parallel to the *Wildlife* litigation. It makes little sense to plow the same earth in this district.

In addition to common legal theories, Defendants argue that the Fourth Circuit's *Wildlife IA* decision "invalidated," "condemned," "struck down," "roundly criticized," and "rejected" Defendants' handling of a "companion" toll road, including its methodology and analysis. It is

10

this unique circumstance – not only a common theory but that theory's support (or not) in *Wildlife IA* that strongly weighs in favor of transfer. Who better to address the reach of *Wildlife IA* than Judge Dever, whose initial Order was under review? Judge Mullen's "substantial efficiencies" finding is only enhanced here.

Finally, transfer would avoid the potential for conflicting decisions from "coordinate courts." *See Feller*, 802 F.2d at 731 n.7 (4th Cir. 1986). Throughout this litigation no judge was ever informed of the potential for conflicting decisions. When this case was scheduled for oral argument,[25] this Court was unaware of a pending and parallel case in this district presided over by Judge Mullen. It does not appear from the filing of the Complaint that Judge Mullen was informed of the existence of this action.[26] Had he been adequately informed, he may well have consolidated both cases before him, reassigned his case to the undersigned, or consolidated and transferred both matters to the Eastern District in light of Judge Dever's prior involvement. In any event, this Court has the first opportunity to assess Plaintiffs' "file in three courts" strategy and to make adjustments so as to accomplish the most efficiency with the least potential for conflict.

**Plaintiffs' Choice of Forum**

As noted by Judge Mullen in *Wildlife II*, typically this Court gives great weight to a plaintiff's choice of forum. Yet for reasons already discussed, this presumption gives way to the unique factors of this case: the original choice of Plaintiffs in the "duplicate" case; the extraordinary overlap in both cases; the experience of the transferee judge with this complicated

---

[25] And rescheduled from the summer to late fall at the request of the parties. (*See* Doc. No. 35, 37, 43).
[26] At the end of Plaintiffs' brief in opposition to transfer in *Wildlife II*, concerning factors they indicated "do not appear relevant," they provided a single citation to the instant case in concluding that the conflict of laws factor "if it is to be considered at all," weighs against transfer. (*Wildlife II*, 3:14-cv-338-GCM, Doc. No. 17 at 25.) This scant reference appears to be the extent of disclosure to Judge Mullen of this parallel matter.

11

field of facts and law; Plaintiffs' forfeiture by lack of candor; and the efficiencies gained by transfer. Judge Mullen's first word is the appropriate last word on this issue:

> Rather than conclude that Plaintiffs have engaged in outright forum shopping, as Defendants assert, the Court will simply note that Plaintiffs did choose where to file the original challenge to this project. As a result of that choice, the Eastern District of North Carolina gained substantial experience and familiarity with the facts of this project and the nature of the challenge against it, making it the obvious forum to hear this second challenge. *See supra* Part III.A. (noting the substantial similarities between this challenge and the previous one despite the existence of new facts and claims). Plaintiffs' contentions that they are at home in this district and that the public here will be most affected were just as true in 2010 when Plaintiffs chose to challenge this project in the Eastern District. Those contentions do not explain why Plaintiffs wish to have a different court hear this second challenge. Thus, while this Court does not lightly disturb Plaintiffs' choice of forum, the Court finds that it is outweighed here by the substantial efficiencies in having this case heard in the Eastern District. *See Commercial Equip.*, 738 F. Supp. at 976.

(*Wildlife II*, 3:14-cv-338-GCM, Doc. No. 27 at 8). By Plaintiffs' myriad assertions, this is a challenge to a duplicate project asserting common deficiencies previously and presently being addressed in the Eastern District of North Carolina. It is the appropriate forum.

## IV. CONCLUSION

For the foregoing reasons, this case will be **TRANSFERRED** from the Western District of North Carolina to the Eastern District of North Carolina pursuant to 28 U.S.C. § 1404 for such further proceedings as that court may deem appropriate.

**SO ORDERED.**

Signed: December 30, 2014

Robert J. Conrad, Jr.
United States District Judge