IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:15-CV-29-D

CATAWBA RIVERKEEPER FOUNDATION, )
and CLEAN AIR CAROLINA, )
)
Plaintiffs, )
)
v. ) **ORDER**
)
NORTH CAROLINA DEPARTMENT OF )
TRANSPORTATION, et al., )
)
Defendants. )

On August 28, 2012, the Catawba Riverkeeper Foundation and Clean Air Carolina ("plaintiffs") filed a complaint in the United States District Court for the Western District of North Carolina against the North Carolina Department of Transportation ("NCDOT"), Eugene Conti, in his official capacity as Secretary of NCDOT, the Federal Highway Administration ("FHWA"), and John F. Sullivan, in his official capacity as Division Administrator of FHWA (collectively, "defendants"). Compl. [D.E. 1] 7.[1] Plaintiffs allege that defendants violated the National Environmental Policy Act ("NEPA"), codified at 42 U.S.C. § 4321 et seq., and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–06, in connection with their decision to construct the Gaston East-West Connector Toll Highway, commonly referred to as the Garden Parkway, in Gaston County and Mecklenburg County, North Carolina. Id. 1, 8.

On April 11, 2013, plaintiffs moved for summary judgment [D.E. 33]. On May 23, 2013, the state and federal defendants moved for summary judgment [D.E. 38, 39]. On June 20, 2013,

---

[1] The court substitutes Secretary Anthony J. Tata (Secretary Conti's successor) as defendant. See Fed. R. Civ. P. 25(d).

plaintiffs moved to supplement the administrative record with two documents [D.E. 40]. On November 10, 2014, plaintiffs again moved to supplement the administrative record with two additional documents or, in the alternative, for the court to take judicial notice of them [D.E. 52].

On December 31, 2014, after hearing oral arguments in the case, the United States District Court for the Western District of North Carolina transferred the case to this court. See [D.E. 57, 58]; 28 U.S.C. § 1404. On February 23, 2015, this court ordered supplemental briefing to address a 2013 change in an authorizing state statute [D.E. 64]. As explained below, the court grants plaintiffs' motion for summary judgment and denies defendants' motion for summary judgment.

I.

This case concerns the planned construction of a 22-mile toll freeway in western North Carolina and whether defendants followed prescribed procedures in selecting the project as the preferred alternative. See Compl. 1; AR 42350. NCDOT began studying the Garden Parkway in 2001. AR 25876.[2] On July 24, 2002, at a project team meeting, defendants agreed that the "purpose of the proposed action is to improve east-west transportation mobility in the area around the City of Gastonia . . . and particularly to establish direct access between the rapidly growing area of southeast Gaston County and west Mecklenburg County." AR 2993. The participants formed the purpose from the "[n]eed to improve mobility, access and connectivity within southern Gaston County" and the "[n]eed to reduce congestion and improve traffic flow . . . in the project study area; improve high-speed, safe regional travel service . . . and generally improve safety . . . in the study area." Id.

In October 2002, the North Carolina state legislature created the North Carolina Turnpike Authority ("NCTA") and authorized the NCTA "to study, plan, develop, and undertake preliminary design work on up to nine Turnpike projects." AR 25876; N.C. Gen. Stat. § 136-89.183(a)(2) (2002)

---

[2] Local municipalities have advocated for new infrastructure since 1991. See AR 5701.

2

(amended 2006).³

Between 2002 and 2004, in addition to looking at possible new roads in Gaston and Mecklenburg counties, defendants "developed and evaluated" six "non-new location alternatives," or alternatives that did not require building a new roadway. AR 4681, 4684. These alternatives included a "No Build" alternative, mass transit, and improvements to existing roadways. AR 4684–94. At an August 17, 2004 meeting, defendants and representatives from other agencies (the "merger team") could not agree which, if any, non-new location alternatives should be studied further. AR 4723. At a September 14, 2004 meeting, the merger team likewise failed to achieve consensus on further study of any non-new location alternatives. AR 4733–38. On October 15, 2004, defendants outlined two "critical basic elements" to the project's purpose and need: (1) "improve east-west mobility and connectivity," and (2) "improve traffic flow on I-85 and US 29/74 (the only existing east-west corridors in the study area)." AR 4750, 4754. The merger team modeled regional travel demand in 2025 and concluded that building a "new location freeway" would more effectively address the "critical basic elements" than improving existing roadways. AR 4756–57.

By July 2005, the merger team had eliminated all non-new location alternatives. AR 5708, 7209; cf. AR 5557. At a September 20, 2005 meeting, the merger team "narrowed down the 90 preliminary new location alternatives to 16 recommended Detailed Study Alternatives." AR 7215; see AR 5709. On October 15, 2008, defendants released a "Final Updated Purpose and Need Statement." AR 21729. The statement included slightly modified needs. Compare AR 21738 (noting the "[n]eed to improve traffic flow on the sections of I-85, US 29-74 and US 321 in the

---

³ In 2006, the state legislature designated the "Gaston East-West Connector" as an authorized project. N.C. Gen. Stat. § 136-89.183(a)(2)(b) (2006). In 2013, the legislature repealed the NCTA's express authority to build the Garden Parkway, but the NCTA continues to have discretion to build turnpikes (including the Garden Parkway) that meet specified conditions. See N.C. Gen. Stat.§ 136-89.183(a)(2)(b) (2013); 2013 N.C. Sess. Laws 183 § 5.1; [D.E. 68] 2–3; [D.E. 69] 2–5.

3

project study area and improve high-speed, safe, reliable regional travel service along the I-85 corridor"), with AR 2993 (noting the "[n]eed to reduce congestion and improve traffic flow on the sections of I-85, US 29-74 and US 321 in the project study area; improve high-speed, safe regional travel service along the US 29-74 intrastate corridor").

In April 2009, the NCTA published the NEPA-required Draft Environmental Impact Statement ("DEIS") analyzing the proposed Garden Parkway construction. AR 25819–26529. In the DEIS, defendants analyzed 12 new-location alternatives and the no-build alternative. AR 25848–49. As part of this analysis, defendants (1) forecasted traffic demand and distribution in the relevant area through 2030, and (2) created a qualitative Indirect and Cumulative Effects ("ICE") report, which is a "qualitative assessment of potential indirect and cumulative land use changes and environmental effects associated with" the alternatives. AR 25877–78, 26088–26109.

"Travel demand is a function of socioeconomic conditions such as residential densities, locations of jobs and services, and trip lengths and distributions for the various types of trip purposes." AR 25884. To forecast this travel demand, defendants relied on the socioeconomic data in the Metrolina Regional Model ("MRM"). Id. The MRM included socioeconomic forecasts by area metropolitan planning organizations ("MPOs") that assumed the construction of the Garden Parkway. See, e.g., AR 6173, 6191, 6203, 35797–98, 36144, 39660–62, 41541, 57849–51; [D.E. 32-10] 3.[4] Defendants used the socioeconomic forecasts to project transportation needs and then,

---

[4] The MRM used a combination of a regional "top-down" approach and a local-area "bottom-up" approach. AR 57850. For the top-down approach, an expert "used national economic data and demographic data to develop regional and county-level population and employment projections." Id.; see AR 3909–4023 (Hammer report). For the bottom-up approach, local MPOs "relied on [Traffic Analysis Zone]-level calculations to estimate future population and employment." AR 57850. Defendants used the regional projections to refine the Traffic Analysis Zone-level ("TAZ-level") projections, and then the TAZ-level projections, including "specific adjustments to account for the proposed Garden Parkway project," were "incorporated into the MRM." AR 57850–51.

4

based on these projected needs, defendants modeled the alternatives' respective road designs to determine traffic forecasts for each. See AR 53473–53605.

The qualitative ICE report reviewed the indirect and cumulative effect of the proposed project on the growth and land use, wildlife habitat, and water resources in the different geographic parts of the study area. AR 26088–26109. Defendants concluded that all of the new-location alternatives had high or moderate potential to improve mobility, access, and connectivity in Gaston and Mecklenburg counties. AR 26107. Defendants also concluded that all of the new-location alternatives had high or moderate potential to lead to accelerated growth and to contribute to changing land use in the Gaston and Mecklenburg counties. Id.

Defendants ultimately decided that the recommended alternative was Detailed Study Alternative 9 ("DSA 9"), a 21.9-mile project. AR 25850. Defendants opened a public-comment period that ended on July 17, 2009. AR 25820. Defendants received and responded to numerous comments from state and federal agencies and the public. See AR 41593–42249.

On August 3, 2010, at the request of other agencies and the public, defendants published a quantitative ICE report, which outside consultants prepared. AR 39654–39747. The quantitative ICE report was, in part, designed to "provide a detailed analysis of the potential indirect land use, water resources and wildlife habitat impacts of the Preferred Alternative." AR 39659. To quantitatively estimate the land use change of the preferred alternative vis-a-vis the No Build alternative, defendants chose a "gravity model approach to estimate the No Build condition because the Build condition was reflected in the prevailing demographic forecasts." AR 39660 (emphasis added). Defendants used the MRM data, including the growth assumptions based on the Garden Parkway's construction, to create the Build forecast. See 39660–61. Then, holding that growth

5

constant, defendants used the gravity model to redistribute the growth effects. AR 39660, 39662.[5] This redistribution "represents households and employment that would have located elsewhere in the Metrolina region under the No Build condition." AR 39662.

On these assumptions, the gravity model indicated that construction of the Garden Parkway would result in 3,700 additional households and 300 fewer jobs in the study area when compared to the No Build alternative. Id. The gravity model also predicted that, in the No Build condition, the absolute number of households and jobs would increase by 42,200 and 33,100, respectively, between 2005 and 2035 in the study area. Id.

On December 21, 2010, defendants published the Final Environmental Impact Statement ("FEIS"). AR 42264–42622. The FEIS reiterated the DEIS's conclusion that DSA 9, the Garden Parkway, was the preferred alternative. AR 42350, 42352–56. The FEIS also restated the quantitative ICE report's findings that building the Garden Parkway would result in an increase of 3,700 households and a decrease of 300 jobs when compared to the No Build scenario. AR 42427.

---

[5] The gravity model redistributes growth at the level of individual Traffic Analysis Zones ("TAZs"). See AR 39675. Mathematically, the gravity model is defined as:

$$Growth_{(j)} = Growth_{(t)} * (\frac{V_{(j)} A_{(j)}}{\sum V_{(i)} A_{(i)}}),$$

where $Growth_{(j)}$ is household or employment growth in the TAZ "j," $Growth_{(t)}$ is total household or employment growth for the entire Metrolina model region, and $V$ and $A$ are functions of land use and attractiveness, and the relative accessibility of TAZ "j." AR 39678–79. $Growth_{(t)}$ is the same in the Build and No Build conditions. The accessibility index, $A_{(j)}$, also appears to be a function of data that assume construction of the Garden Parkway. See AR 39679 (explaining that the index is a function of employment in each TAZ and the travel time between TAZs, where the travel time was modeled on socioeconomic data assuming construction); State Defs.' Reply [D.E. 45] 12 ("'Travel time' between origins and destinations is an ingredient of the MRM . . . ."). Thus, the gravity model explicitly assumes the same regional growth, spurred at least in part by construction of the Garden Parkway, in both the Build and No Build conditions. See AR 35802.

6

In April 2011, the Gaston County Chamber of Commerce published a report on the "Economic Impact of the Garden Parkway" (the "Connaughton Report"). See AR 44667–72, 50767. The Connaughton Report concluded that the Garden Parkway would result in an increase of 11,328 households and an additional 17,828 jobs in Gaston County. AR 50770; see AR 44671.

In February 2012, the FHWA issued the NEPA-required Record of Decision ("ROD"). AR 51676–51986. The ROD reflected defendants' final decision to identify the Garden Parkway as the "Selected Alternative." AR 51680. In making this decision, defendants "considered the information and analyses documented in the [DEIS], the [FEIS], this Record of Decision, and comments received from agencies and the public." Id. The Garden Parkway proposal included "four twelve-foot travel lanes, with a grassed median and paved inside and outside shoulders." AR 51686. Defendants anticipated an interim phase that would construct a two-lane roadway for approximately 6 miles of the eventual 21.9-mile project. AR 51781. The Garden Parkway "represent[ed] the best overall balanced minimization of all impacts analyzed" and was the "environmentally preferable alternative." AR 51683.

On June 1, 2012, in light of North Carolina Wildlife Federation v. North Carolina Department of Transportation, 677 F.3d 596 (4th Cir. 2012), plaintiffs asked defendants to prepare a supplemental EIS to address the methodology underlying its impact analysis for the proposed Garden Parkway. AR 58131. On August 14, 2012, plaintiffs again asked defendants to prepare a supplemental EIS. AR 58186–90. On August 31, 2012, defendants declined plaintiffs' request. AR 58198–99. On August 28, 2012, plaintiffs filed this action. See Compl. 29.

II.

Summary judgment is appropriate if the moving party demonstrates that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.

7

R. Civ. P. 56(a). The party seeking summary judgment must initially show an absence of genuine dispute of material facts or the absence of evidence to support the nonmoving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). If a moving party meets its burden, the nonmoving party must "come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quotation and emphasis omitted). A genuine issue for trial exists if there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient." Id. at 252; see Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985) ("The nonmoving party, however, cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another."). Only factual disputes that might affect the outcome under substantive law properly preclude summary judgment. Anderson, 477 U.S. at 248. In reviewing the factual record, the court views the facts in the light most favorable to the nonmoving party and draws reasonable inferences in that party's favor. Matsushita, 475 U.S. at 587. "When cross-motions for summary judgment are before a court, the court examines each motion separately, employing the familiar standard under Rule 56 of the Federal Rules of Civil Procedure." Desmond v. PNGI Charles Town Gaming, L.L.C., 630 F.3d 351, 354 (4th Cir. 2011).

"NEPA claims are subject to judicial review under the" APA. N.C. Wildlife Fed'n, 677 F.3d at 601. The APA requires courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); see Dep't of Transp. v. Pub. Citizen, 541 U.S. 752, 763 (2004); N.C. Wildlife Fed'n, 677 F.3d at 601. The court's inquiry into "whether there has been a clear error of judgment . . . . must be searching and careful, but the ultimate standard of review is

a narrow one." Marsh v. Or. Natural Res. Council, 490 U.S. 360, 378 (1989) (quotations omitted); N.C. Wildlife Fed'n, 677 F.3d at 601; Hughes River Watershed Conservancy v. Johnson, 165 F.3d 283, 287 (4th Cir. 1999). This standard is "highly deferential" but "does not reduce judicial review to a rubber stamp of agency action." Friends of Back Bay v. U.S. Army Corps of Eng'rs, 681 F.3d 581, 587 (4th Cir. 2012) (quotations omitted). "A reviewing court must ensure that the agency has examined the relevant data and articulated a satisfactory explanation for its actions . . . ." N.C. Wildlife Fed'n, 677 F.3d at 601 (quotation and alterations omitted).

NEPA requires agencies to follow "a set of action-forcing procedures that require that agencies take a hard look at environmental consequences and that provide for broad dissemination of relevant environmental information." Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 350 (1989) (quotations and citation omitted); see also Defenders of Wildlife v. N.C. Dep't of Transp., 762 F.3d 374, 393 (4th Cir. 2014); Friends of Back Bay, 681 F.3d at 587; N.C. Wildlife Fed'n, 677 F.3d at 601. "NEPA itself does not mandate particular results, but simply prescribes the necessary process." Robertson, 490 U.S. at 350. Thus, "NEPA merely prohibits uninformed—rather than unwise—agency action." Id. at 351.

III.

Plaintiffs challenge the FEIS in four ways. First, they claim that defendants failed to adequately assess and disclose environmental impacts in the FEIS. Compl. ¶¶ 104–13. Second, they claim that defendants' alternatives analysis was improper. Id. ¶¶ 114–22. Third, they claim that defendants did not prepare the FEIS in good faith or properly respond to public comments. Id. ¶¶ 123–28. Fourth, they claim that defendants failed to produce a supplemental EIS in light of new information requiring such a production. Id. ¶¶ 129–33.

9

A.

The court considers plaintiffs' second claim first, as did plaintiffs in their memorandum. See [D.E. 33-1] 24. Plaintiffs argue that defendants violated NEPA and the APA by making improper assumptions about future growth in analyzing the No Build alternative in the FEIS. See Compl. ¶¶ 114–22. NEPA requires agencies contemplating "major Federal actions significantly affecting the quality of the human environment" to prepare an environmental impact statement. 42 U.S.C. § 4332(C); see 40 C.F.R. §§ 1502.3, 1502.4.[6] The EIS must "present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public." 40 C.F.R. § 1502.14. This alternatives analysis "is the heart of the environmental impact statement." Id. The analysis must include direct and indirect effects of the alternatives. See 40 C.F.R. § 1502.16. For agencies to define the range of alternatives, they must first "briefly specify the underlying purpose and need." 40 C.F.R. § 1502.13. The agencies then must "[r]igorously explore and objectively evaluate all reasonable alternatives" to meet that purpose and need. 40 C.F.R. § 1502.14(a). Furthermore, agencies must "[i]nclude the alternative of no action" in the EIS whether or not it has been eliminated as a reasonable alternative. 40 C.F.R. § 1502.14(d); N.C. Wildlife Fed'n, 677 F.3d at 602.

Plaintiffs contend that defendants used the same socioeconomic data for both the Build and No Build conditions in the quantitative ICE report and the FEIS and that the Fourth Circuit rejected this approach in North Carolina Wildlife Federation, 677 F.3d at 601–05. The administrative record shows that defendants used the same socioeconomic data in analyzing the traffic forecasts and direct

---

[6] The parties agree that the proposed Garden Parkway project constitutes a "major federal action" that requires an EIS.

10

and indirect effects of both alternatives and that these underlying data assumed the construction of the Garden Parkway. See, e.g., AR 6203 ("It is emphasized that the population and employment forecasts contained in the [MRM] directly relate to the traffic growth forecasted by the models. The Gaston East-West Connector . . . [is] included in the model."); AR 35798 ("GUAMPO and MUMPO stated that the Gaston East-West Connector was considered in making the demographic forecasts for the model. . . . [I]t was decided to use the projections as the No Build condition, even though some consideration of the project may be embedded in the Gaston and Mecklenburg County forecasts."); AR 36144 ("[NCTA is] concerned about the agencies buying into the theory that overall growth does not change with or without the project—it just redistributes. This is the same assumption used in the Monroe Connector project, but it was presented somewhat differently."); AR 39660 ("[C]oordination with MPOs and county planning departments led to the decision to use the gravity model approach to estimate the No Build condition because the Build condition was reflected in the prevailing demographic forecasts."); AR 39678–79 (explaining the gravity model); AR 57849 ("[L]ocal planners anticipated completion of the project when developing and allocating future population and employment for the MRM . . . [and] then calculated the 'No-Build' condition using a gravity model analysis in which the project and its associated effect on population and employment were removed."). Indeed, defendants concede this point in an illustrative diagram. See [D.E. 39-4] 2 (noting that "socioeconomic data with the road" is used to create traffic models with and without the road). Thus, the court turns to whether, as a matter of law, defendants' use of the same underlying socioeconomic data to model the Build and No Build scenarios satisfies NEPA's procedural requirements.

In North Carolina Wildlife Federation, the Fourth Circuit confronted an almost-identical situation. There, the defendants, who are the same defendants in this case, "created the 'no-build'

11

baseline using information from a local planning organization." N.C. Wildlife Fed'n, 677 F.3d at 599. The MPOs used the same top-down, bottom-up approach that is used in this case to generate growth projections throughout the study area. Id. The projections were based on a number of factors, including a TAZ's "time to employment," which was itself based off an "anticipated roadway network [that] <u>included</u> the proposed Monroe Connector." Id. The Fourth Circuit found that "although [defendants] used MUMPO's projections as the 'no build' baseline, part of MUMPO's data actually <u>assumed construction of the Monroe Connector</u>. By using MUMPO's data, . . . the Agencies incorporated 'build' assumptions into the 'no build' baseline." Id. at 599–600. After noting that "the accuracy of the 'no build' baseline" was "a critical aspect of the NEPA process," the Fourth Circuit stated that "courts not infrequently find NEPA violations when an agency miscalculates the 'no build' baseline or when the baseline assumes the existence of a proposed project." Id. at 603.

The ultimate holding in North Carolina Wildlife Federation turned on a narrower question of disclosure. There, the defendants had "not only failed to disclose the assumptions underlying MUMPO's data, but provided the public with erroneous information." Id. Specifically, the defendants had repeatedly denied using "Build" assumptions in the "No Build" alternative, and the truth was only discovered or revealed during litigation. Id. at 600, 602–03. Despite the lack of disclosure, defendants argued that their decision should be accorded deference because of their experience, their consideration of public comments, and their "thorough analysis of the environmental impacts." Id. at 603. The Fourth Circuit rejected this argument and stated:

> In sum, <u>although we need not and do not decide whether NEPA permits the Agencies to use MUMPO's data in this case</u>, we do hold that by doing so without disclosing the data's underlying assumptions and by falsely responding to public concerns, the Agencies failed to take the required 'hard look' at environmental consequences.

12

Id. at 605 (quotation omitted, emphasis added).

The lack of disclosure that was dispositive in North Carolina Wildlife Federation does not exist in this case. Although plaintiffs complain that the description of the assumptions underlying the FEIS's conclusions changed through the editing process, see Pl.'s Mem. Supp. Mot. Summ. J. [D.E. 33-1] 45–46, such edits do not amount to a failure to disclose the key assumptions in creating the No Build baseline. See, e.g., Webster v. U.S. Dep't of Agric., 685 F.3d 411, 425 (4th Cir. 2012) (noting that, in considering which information to put in an EIS, agencies "face a delicate balancing act: they must include enough details about a proposed action to allow for the requisite hard look at its environmental effects without providing so much information that the EIS becomes self-defeating"). Deciding which details to include in the EIS is left to the agencies' discretion unless the agencies' exercise of discretion "prevented the agency from taking a hard look at the action's environmental effects or the public from participating in the decisionmaking process." Id. Here, the quantitative ICE report and the FEIS disclosed the key assumption that projected growth remained the same in the Build and No Build conditions and that the same underlying socioeconomic data were used. See, e.g., AR 39660–61 (quantitative ICE report); AR 42427 (FEIS). During the public-comment process, plaintiffs raised the issue. AR 51803–04. Defendants responded and noted that "NCTA 'ran' the MRM without the project as an input for the 'no-build' traffic forecast." AR 51815–16 (emphasis added). Although plaintiffs may have preferred a more easily-digested description of the analysis, defendants did not fail to adequately disclose their assumptions.

Nonetheless, defendants violated NEPA and the APA by using the same set of socioeconomic data that assumed construction of the Garden Parkway to assess the environmental impacts of the Build and No Build alternatives. In North Carolina Wildlife Federation, the Fourth Circuit strongly suggested that assuming the construction of the proposed project when analyzing the No Build

13

baseline was clear error. 677 F.3d at 603 ("Without accurate baseline data, an agency cannot carefully consider information about significant environment impacts . . . resulting in an arbitrary and capricious decision." (quotation and alteration omitted)). In Friends of Back Bay, decided the month after North Carolina Wildlife Federation, the Fourth Circuit called a materially indistinguishable error an "obvious and fundamental blunder" and stated that "[a] material misapprehension of the baseline conditions existing in advance of an agency action can lay the groundwork for an arbitrary and capricious decision." 681 F.3d at 588. Similarly, in Friends of Yosemite Valley v. Kempthorne, 520 F.3d 1024 (9th Cir. 2008), the Ninth Circuit found a NEPA violation where the agency's supplemental EIS included a baseline alternative that "assumed the existence of the very plan being proposed." Id. at 1026. The Ninth Circuit found that assumption "logically untenable" despite "the deference owed to the agency's choice of a 'no-action' alternative." Id. at 1038. Simply put, defendants' fundamental assumption that the Garden Parkway would have no effect on overall growth in the Metrolina region, unsupported by any evidence showing complete saturation of the region, and their use of the gravity model to reallocate assumed growth in the No Build condition constitute clear error and violates NEPA and the APA.[7]

In opposition to this conclusion, defendants make two arguments. First, they argue that the Build data did not taint the No Build data. See Fed. Defs.' Mem. Supp. Mot. Summ. J. [D.E. 39-1] 38; State Defs.' Mem. Supp. Mot. Summ. J [D.E. 38-1] 29 n.16 (claiming that defendants created different Build and No Build projections); Fed. Def.'s Reply [D.E. 47] 8 (asserting that plaintiff's

---

[7] In Laguna Greenbelt, Inc. v. United States Department of Transportation, 42 F.3d 517 (9th Cir. 1994) (per curiam), the Ninth Circuit affirmed an agency's assumption that the proposed tollroad would not influence growth in the project area. The Ninth Circuit relied, however, upon an administrative record that showed that "98.5% of all land in the project's 'area of benefit' [wa]s already accounted for by either existing or committed land uses not contingent on construction of the corridor." 42 F.3d at 525. The record her contains no evidence of such saturation. Thus, Laguna does not help defendants. See N.C. Wildlife Fed'n, 67 F.3d at 603 n.2.

14

argument "ignores the two separate sets of data that the agencies developed for comparison"). As support, they cite a single sentence from plaintiffs' submitted comments that they rip from its context. Compare Fed. Defs.' Mem. Supp. Mot. Summ. J. 25 ("Indeed, [plaintiffs] admitted that 'it is clear that the correct approach is the one employed in this FEIS, and not the approach currently being challenged in Monroe.'" (quoting AR 51803) (emphasis omitted)), with AR 51803 ("It is clear that the correct approach is the one employed in this FEIS, and not the approach currently being challenged . . . regarding the Monroe project. If the MRM assumes construction of the Gaston East-West Connector then it is correct to use that model to create a 'Build' scenario." (emphasis added)). Defendants' argument, however, contradicts the administrative record. Indeed, the administrative record establishes that the defendants' growth and impact projections in the No Build scenario explicitly relied on socioeconomic data that assumed construction of the Garden Parkway—the precise "taint" that the Fourth Circuit condemned in North Carolina Wildlife Federation. See, e.g., AR 36144 (email among defendants' employees noting concern "about the agencies buying into the theory that overall growth does not change with or without the project—it just redistributes. This is the same assumption used in the Monroe Connector project, but it was presented somewhat differently."). The court rejects defendants' attempt to distinguish North Carolina Wildlife Federation. See, e.g., Fed. Defs.' Mem. Supp. Mot. Summ. J. 25–26, 32. Defendants' use of the gravity model to redistribute geographically the assumed growth from the Build condition does not meaningfully distinguish this case from North Carolina Wildlife Federation and cannot redeem their analysis.

Second, defendants argue that the court should defer to their decision to use a single set of socioeconomic data for both the Build and No Build conditions. See id. 27–28; State Defs.' Mem. Supp. Mot. Summ. J 18–19, 26; State Defs.' Reply [D.E. 45] 10. In support, defendants cite

15

American Electric Power Company v. Connecticut, 131 S. Ct. 2527 (2011), for the straightforward proposition that "[f]ederal judges lack the scientific, economic, and technological resources an agency can utilize in coping with issues." 131 S. Ct. at 2539–40. The court may defer, for example, to the agencies' choice of specific methodologies for separately forecasting growth in Build and No Build scenarios. See Hughes River, 165 F.3d at 289 ("Agencies are entitled to select their own methodology as long as that methodology is reasonable." (emphasis added)). When defendants use their discretion, however, to simply assume that the total regional growth will be equivalent in both scenarios rather than use their "scientific, economic, and technological resources" to independently predict future growth under both alternatives, they violate NEPA's statutory and regulatory requirements and the court's deference to their choice ceases.

In sum, defendants made an unsupported assumption that growth in the Metrolina region would remain constant regardless of whether the Garden Parkway was built. In so doing, they failed to take a "hard look" at the environmental impacts of the proposed Garden Parkway and violated NEPA and the APA by preparing an inadequate EIS. Accordingly, the court grants plaintiffs' motion for summary judgment and vacates the Record of Decision for the Garden Parkway project.[8]

B.

Plaintiffs also request injunctive relief. "[A] court should not automatically enjoin agency action whenever it finds a NEPA violation." Nat'l Audubon Soc'y v. Dep't of the Navy, 422 F.3d 174, 202 (4th Cir. 2005). The court looks "to traditional principles of equity to determine what form of injunctive relief, if any, is appropriate to remedy a statutory violation." Id. at 200. "[T]he basis for injunctive relief in the federal courts has always been irreparable injury and the inadequacy of

---

[8] In light of this holding, the court need not address plaintiffs' other NEPA claims. See N.C. Wildlife Fed'n, 677 F.3d at 605 n.5. The court also dismisses as moot plaintiffs' motions to supplement the administrative record [D.E. 40, 52].

16

legal remedies." Weinberger v. Romero-Barcelo, 456 U.S. 305, 312 (1982). "Where the harms of a particular injunctive remedy outweigh the benefits, a court may decline to adopt it." Nat'l Audubon Soc'y, 422 F.3d at 201; see Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 24–33 (2008).

Agencies may not take any action that would have an adverse environmental impact or limit the choice of reasonable alternatives until they issue a record of decision. See, e.g., Nat'l Audubon Soc'y, 422 F.3d at 201; 40 C.F.R. § 1506.1(a). In light of the vacatur of defendants' Record of Decision and the current status of the project, see [D.E. 68] 2–3; [D.E. 69] 3–5, the court determines that no injunctive relief is necessary at this time. The court expects defendants to comply with all applicable regulations, including, should they choose to move forward with the project, the issuance of a supplemental EIS that corrects the above-discussed error by constructing an appropriate No Build scenario, with socioeconomic data that do not assume construction of the Garden Parkway, and also a new Record of Decision, before taking any action that would violate section 1506.1. Should defendants take actions inconsistent with this order, the court will reconsider whether to issue an injunction.

IV.

In sum, the court GRANTS plaintiffs' motion for summary judgment [D.E. 33] and DENIES defendants' motions for summary judgment [D.E. 38, 39]. The Record of Decision is VACATED. The court DISMISSES as moot plaintiffs' motions to supplement the administrative record [D.E. 40, 52].

SO ORDERED. This 13 day of March 2015.

JAMES C. DEVER III
Chief United States District Judge